IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| WILLIE LOUIS MACK, | ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | 7:16-cv-01872-LSC |
| WALTER MADDOX, et al., | ) ) | |
| Defendants. | ) ) | |
| | ) ) | |

**MEMORANDUM OF OPINION**

Plaintiff Willie Louis Mack ("Mack"), proceeding *pro se*, filed this action against Defendants Walter Maddox ("Maddox"), in his official capacity as the Mayor of the City of Tuscaloosa; the West Alabama Narcotics Task Force ("WANTF"); and several WANTF agents and criminal investigators,[1] in their individual and official capacities (collectively, "Defendants"), alleging claims under 42 U.S.C. §§ 1983 and 1985. Before this Court are motions to dismiss filed by Larkin (Doc. 7); Windham, Mills, Cousette, and Jones (Doc. 13); and Maddox (Doc. 15). For the reasons stated more fully herein, Larkin's motion is due to be

---

[1] These individuals are Deputy M.T. Larkin ("Larkin"), as well as Windham, Mills, Cousette, and Jones, who are identified only by their last names. The complaint alleges that Windham and Mills are WANTF agents and that Cousette and Jones are criminal investigators employed by the City of Tuscaloosa (the "City").

granted in part and denied in part. Maddox's motion to dismiss and the motion to dismiss filed by Windham, Mills, Cousette, and Jones are due to be granted.

## I. Background[2]

On November 18, 2014, Tuscaloosa County Circuit Judge Brad Almond issued a warrant authorizing the search of Mack's address, which was described as "a tan residence with a red roof," for controlled substances. The subject of the warrant was an individual named Anthony Carl Benson ("Benson"), "a black male in his mid[-]twenties [who is] approximately 6'05" tall and weighs approximately 252 pounds." Larkin prepared the warrant application, and his affidavit in support of the warrant asserted that he "received information from a reliable confidential informant that ha[d] personally observed a quantity of marijuana in the possession of a black male known as [Benson] while at his residence," which was stated to be Mack's address.

The morning of November 20, 2014, Windham, Mills, Cousette, and Jones arrived at Mack's residence to execute the warrant. When Mack answered the door, the officers, who were dressed in plain clothes, identified themselves as members of WANTF. Windham, the lead WANTF agent, asked Mack if Benson

---

[2] In evaluating a motion to dismiss, this Court "accept[s] the allegations in the complaint as true and construe[s] the facts in the light most favorable to the plaintiff." *Johnson v. Midland Funding, LLC*, 823 F.3d 1334, 1337 (11th Cir. 2016).

was present at the home, and Mack told the officers that Benson did not live there. Windham then stated that WANTF had "conducted a controlled drug buy" inside Mack's residence on November 17, 2014, during which Benson sold marijuana to a WANTF confidential informant. Windham also informed Mack that WANTF had a warrant to search the home. When Mack asked to see the warrant, the officers showed him the warrant for which Larkin had applied several days earlier.

Mack then began to argue with the officers, stating that they knew Benson did not live at Mack's residence and had never visited Mack's home since Mack had lived there. Mack also stated that the officers knew that Benson had never sold marijuana from Mack's home or on Mack's property. Mack alleges that a video, which he has attached to his complaint, demonstrates the officers' knowledge of these facts because the video shows that the sale to the confidential informant actually occurred inside a vehicle that was parked on the public street. Windham ignored Mack's arguments, however, and ordered another agent to place Mack and his wife, Angela Roberts ("Roberts"), in handcuffs. During a search of the home and of Mack's and Roberts's person, the officers discovered "a pack of Top Cigarette rolling papers and a single partially smoked marijuana cigarette."

## II.  STANDARD OF REVIEW

In general, a pleading must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, in order to withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a complaint "must plead enough facts to state a claim to relief that is plausible on its face." *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1347–48 (11th Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Stated another way, the factual allegations in the complaint must be sufficient to "raise a right to relief above the speculative level." *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1291 (11th Cir. 2010). A complaint that "succeeds in identifying facts that are suggestive enough to render [the necessary elements of a claim] plausible" will survive a motion to dismiss. *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1296 (11th Cir. 2007) (quoting *Twombly*, 550 U.S. at 556) (internal quotation marks omitted).

In evaluating the sufficiency of a complaint, this Court first "identif[ies] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. This Court then "assume[s] the[]

veracity" of the complaint's "well-pleaded factual allegations" and "determine[s] whether they plausibly give rise to an entitlement to relief." *Id.* Review of the complaint is "a context-specific task that requires [this Court] to draw on its judicial experience and common sense." *Id.* If the pleading "contain[s] enough information regarding the material elements of a cause of action to support recovery under some 'viable legal theory,'" it satisfies the notice pleading standard. *Am. Fed'n of Labor & Cong. of Indus. Orgs. v. City of Miami*, 637 F.3d 1178, 1186 (11th Cir. 2011) (quoting *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 683–84 (11th Cir. 2001)). Additionally, because Mack proceeds *pro se* in this matter, his complaint, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106)).

## III. DISCUSSION

### A. STATUTE OF LIMITATION

Defendants assert that Mack's claims are time-barred because his complaint was filed beyond the two-year statute of limitation. "Claims brought pursuant to [§ 1983] are subject to the . . . limitations period governing personal injury actions in the state where the action is brought." *Wellons v. Comm'r, Ga. Dep't of Corr.*, 754 F.3d 1260, 1263 (11th Cir. 2014). In Alabama, general personal injury actions

must be brought within two years of the date the action accrues. Ala. Code § 6-2-38(*l*); *see City of Birmingham v. Leberte*, 773 So. 2d 440, 444 n.1 (Ala. 2000) (quoting *Payne v. Ala. Cemetery Ass'n*, 413 So. 2d 1067, 1072 (Ala. 1982)). The events alleged in Mack's complaint occurred on November 20, 2014. Pursuant to § 6-2-38(*l*), any action based on those events must have been filed on or before November 20, 2016. Mack's complaint was filed on November 21, 2016.[3]

Mack first asserts that because his complaint alleges intentional conduct, the six-year statute of limitation applicable to actions for "trespass to person or liberty" governs the timeliness of his suit. *See* Ala. Code § 6-2-34(1). Because Alabama law "provides multiple statutes of limitation[] for personal injury actions," however, this Court must apply "the general or residual statute for personal injury actions" to a § 1983 claim, rather than the statute of limitation addressing particular intentional torts. *Owens v. Okure*, 488 U.S. 235, 249–50 (1989). Mack's suit is thus subject to the two-year limitations period for general personal injury actions, Ala. Code § 6-2-38(*l*), and he must have filed his complaint by November 20, 2016.

---

[3] Although Mack's hand-filed complaint was not entered onto the docket by the Clerk until November 23, 2016, the docket entry clearly states that the complaint was filed on November 21, 2016.

Mack next argues that because November 20, 2016, was a Sunday and the courthouse was closed, his complaint was timely filed because he filed it on the next business day. Fed. R. Civ. P. 6(a)(1)[4] provides that "if the last day [of the limitations period] is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday." Therefore, the limitations period applicable to Mack's claims expired on Monday, November 21, 2016. His complaint was timely filed, and Defendants' motions to dismiss on this ground are due to be denied.

### B. Maddox's Motion to Dismiss

Because Mack brings suit against Maddox in his official capacity as "Mayor for the City of Tuscaloosa," his claims against Maddox are construed as claims against the City. *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991) (per curiam). In order to state a § 1983 claim against a municipal defendant, a plaintiff must demonstrate "that the City had a policy, custom, or practice that caused the deprivation" of the plaintiff's constitutional rights. *Hoefling v. City of Miami*, 811 F.3d 1271, 1279 (11th Cir. 2016). Thus, the plaintiff must allege that the

---

[4] Because federal courts "borrow" a state statute of limitation for § 1983 claims, *Lufkin v. McCallum*, 956 F.2d 1104, 1106 (11th Cir. 1992), Fed. R. Civ. P. 6(a) "govern[s] the computation of the limitations period." *Merriweather v. City of Memphis*, 107 F.3d 396, 398 (6th Cir. 1997). This distinction is immaterial, however, as application of the Alabama statute governing computation of time leads to an identical result in this case. *See* Ala. Code § 1-1-4 ("[I]f the last day is Sunday, . . . the next succeeding secular or working day shall be counted as the last day within which the act may be done.").

constitutional violation was caused by "an official policy enacted by [a municipality's] legislative body," *id.*, or "a practice or custom that is so pervasive[] as to be the functional equivalent of a policy adopted by the final policymaker," *Goodman v. Kimbrough*, 718 F.3d 1325, 1335 (11th Cir. 2013).

Maddox argues that Mack has failed to allege that the City had such a policy, custom, or practice. Mack responds that he "made various attempts" to obtain copies of the City's procedures related to "seeking and executing search warrants" and "relying upon the information of a confidential informant" but was informed "that such information is . . . not available to the public." He asks this Court to order Defendants to provide this information to him. However, "discovery follows the filing of a well-pleaded complaint. It is not a device to enable the plaintiff to make a case when his complaint has failed to state a claim." *Carter v. DeKalb Cnty., Ga.*, 521 F. App'x 725, 728 (11th Cir. 2013) (per curiam) (quoting *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1367 (11th Cir. 1997)) (internal quotation marks omitted) (emphasis deleted); *see Iqbal*, 556 U.S. at 678–79 ("Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."). Because a motion to dismiss for failure to state a claim upon which relief can be granted "presents a purely legal question[,] . . . neither the parties nor

the court have any need for discovery before the court rules on the motion." *Chudasama*, 123 F.3d at 1367.

Even if Mack's complaint is construed liberally, as it must be, *Erickson*, 551 U.S. at 94, he does not allege facts demonstrating that a municipal policy or custom caused any deprivation of his rights. Rather, he states that "because each of the Defendant(s) West Alabama Narcotics Task Force and its Agents operates and are empowered to act under the color of law as agents for the City of Tuscaloosa by the City Counsel and Mayor's office both, Mayor Walter Maddox and the City of Tuscaloosa are directly responsible for not only the agents' deliberate indifference for and a complete and deliberate depravation of Plaintiff's civil and constitutional rights . . . but also for their agents' knowing and intentionally egregious and extremely gross misconduct." These allegations sound in vicarious liability, which cannot serve as the basis for § 1983 liability against a municipality. *Hoefling*, 811 F.3d at 1279 (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 693–94 (1978)). Maddox's motion to dismiss is therefore due to be granted.

### C. Larkin's Motion to Dismiss

#### 1. Official Capacity Claims

Larkin first argues that, as a deputy sheriff, he is absolutely immune from Mack's claims against him in his official capacity. The Eleventh Amendment

prohibits suits against a state in federal court without that state's consent, and this sovereign immunity "extend[s] to state officials, acting in their official capacit[ies], where an agency or individual may be treated as an arm of the State." *Melton v. Abston*, 841 F.3d 1207, 1233 (11th Cir. 2016) (per curiam) (internal quotation marks omitted). To determine whether an official acts as an "arm of the State," this Court looks to "the particular function in which the [official] was engaged when taking the actions out of which liability is asserted to arise" and considers (1) how state law defines the entity of which the defendant is a part; (2) what degree of control the state maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity. *Manders v. Lee*, 338 F.3d 1304, 1308–09 (11th Cir. 2003) (en banc). If a weighing of the factors demonstrates that the official is subject to the control of the state when performing the particular function at issue, the official acts on behalf of the state and is entitled to the state's Eleventh Amendment immunity with regard to claims against him in his official capacity. *See Lake v. Skelton*, 840 F.3d 1334, 1337–38 (11th Cir. 2016).

The first of these factors, how state law defines the entity, weighs in favor of the application of Eleventh Amendment immunity. Larkin submitted the affidavit

for the search warrant by virtue of his position as a deputy sheriff.[5] In Alabama, a deputy sheriff is "the alter ego of the sheriff," and his acts are considered to be "the acts of the sheriff." *Alexander v. Hatfield*, 652 So. 2d 1142, 1144 (Ala. 1994). The "sheriff for each county" is an executive officer of the state. Ala. Const. art V, § 112; *Parker v. Amerson*, 519 So. 2d 442, 443 (Ala. 1987). His powers and duties derive from the state legislature. Ala. Code § 36-22-3. Each sheriff is elected by voters of the county he serves, Ala. Const. art. V, § 138, and the exercise of his authority is largely limited to that county, Ala. Code § 36-22-3. Nonetheless, Alabama law clearly defines the sheriff as a state officer. *See Ex parte Shelley*, 53 So. 3d 887, 891 (Ala. 2009); *Parker*, 519 So. 2d at 444 ("The drafters [of the Alabama Constitution] thought sheriffs to be members of the executive branch who executed the laws of the state in the several counties."); *see also Ex parte Blankenship*, 893 So. 2d 303, 305 (Ala. 2004) (providing that with respect to claims arising under Alabama law, "an action against a sheriff—or a deputy sheriff—for damages arising out of the performance of his duties is essentially a suit against the state" (internal quotation marks omitted)).

---

[5] Larkin stated in the warrant affidavit attached to the complaint that he acted both as "a deputy with the Tuscaloosa County Sheriff's Office" and as "an investigator with [WANTF]." Because Larkin participated in WANTF through his employment as a deputy sheriff, this Court treats Mack's official capacity claims against Larkin as claims against him in his capacity as a deputy sheriff.

The second factor, where state law vests control over the relevant function, also weighs in favor of Eleventh Amendment immunity. Alabama law provides that the sheriff has a duty "[t]o, with the assistance of deputies as necessary, ferret out crime, apprehend and arrest criminals[,] and . . . secure evidence of crimes in [his] count[y]." Ala. Code § 36-22-3(4). The application for a search warrant pursuant to a criminal investigation—the function at issue here—is logically included within the sheriff's law enforcement duties. The county commission, as the county's governing body, "cannot instruct the sheriff how to ferret out crime, how to arrest a criminal, or how to secure evidence of a crime." *McMillian v. Monroe Cnty.*, 520 U.S. 781, 790 (1997); *see White v. Birchfield*, 582 So. 2d 1085, 1088 (Ala. 1991) ("The state has a manifest interest and concern for the observance and enforcement of its criminal laws, and in the freedom of its officers to perform their duty in the detection of offenses and offenders against its laws. To restrain the sheriff and his deputies in that regard impinges upon—brings into question—the powers of the state itself." (quoting *Montiel v. Holcombe*, 199 So. 245, 246 (Ala. 1940)). By contrast, the attorney general and the governor, who are also executive officers of the state, Ala. Const. art. V, § 112, may direct the sheriff to investigate "any alleged violation of law" within his county. Ala. Code § 36-22-5; *see McMillian*, 520 U.S. at 791. Further, the circuit judge presiding over the county

served by the sheriff—a state officer—"exercise[s] a general supervision of" the sheriff to ensure "the prompt, diligent discharge of [his] duties." Ala. Code § 12-17-24; *see id.* § 36-22-3(2) (commanding sheriff "to obey the lawful orders of [the] courts"). The authority to remove a sheriff from office in the event of misconduct is vested in the Alabama Supreme Court. Ala. Const. art. VII, § 174; *see State ex rel. Strange v. Clark*, No. 1151021, 2016 WL 4044903 (Ala. 2016) (to be published in So. 3d). Taken together, these facts demonstrate that the state, rather than an individual county, authorizes the sheriff to perform his law enforcement duties, and while the county cannot direct the sheriff's efforts to do so, state officials may. This supports the conclusion that a sheriff acts as a state officer for the purpose of applying for a search warrant.

The third factor, "the source of funding for the function at issue," *Lake*, 840 F.3d at 1343, also favors immunity, though to a lesser degree than the preceding factors. In general, the county commission funds the operation of the sheriff's office. Ala. Code § 36-22-18 (directing county commission to "furnish the sheriff" with materials "reasonably needed for the proper and efficient conduct of the affairs of the sheriff's office"). The sheriff's salary is also paid from the county treasury. *Id.* § 36-22-16(a). Fees payable to the sheriff's office are placed into the county's general fund. *Id.* § 36-22-17. However, the fact that the county "bears the

major burden" to fund the sheriff's office does not urge a finding that the sheriff is a county officer, rather than a state officer. *See Manders*, 338 F.3d at 1323. The county funds the sheriff's office because state law "so mandates," and any "financial control" the county exercises over the sheriff "is attenuated." *Id.*; *see McMillian*, 520 U.S. at 791–92 ("The county commissions do … have the discretion to deny funds to the sheriffs for their operations beyond what is 'reasonably necessary.' But at most, this discretion would allow the commission to exert an attenuated and indirect influence over the sheriff's operations." (internal citation omitted)). "Payment of [the sheriff's] budget, when required by the State, does not establish any control by [the county]" over the sheriff's law enforcement duties, and "state involvement [through legislation directing the funding of the sheriff's office] is sufficient to tilt the third factor of the Eleventh Amendment analysis toward immunity." *Manders*, 338 F.3d at 1324.

The fourth and final factor, the responsibility for payment of judgments, is least supportive of granting Eleventh Amendment immunity but is insufficient to tip the scales toward the denial of immunity. *See id.* at 1328. Alabama law is clear that the county is not vicariously liable for the acts of the sheriff, *White*, 582 So. 2d at 1087, and is not responsible for the payment of adverse judgments on this basis. *See Manders*, 338 F.3d at 1326. State law neither directs the county to pay

judgments against the sheriff nor provides that the state will do so. The source of funding for the payment for adverse judgments is therefore unclear, but "the Supreme Court [has never] required an actual drain on the state treasury as a per se condition of Eleventh Amendment immunity." *Id.* at 1328. "[T]he State's sovereignty and thus its integrity remain directly affected when federal court lawsuits interfere with a state program or function" such as a county sheriff's enforcement of state law. *Id.* at 1329.

Because an analysis of these factors favors the application of Eleventh Amendment immunity, Larkin is entitled to this immunity. *See Lake*, 840 F.3d at 1344. Additionally, because Mack's complaint seeks relief in the form of money damages, rather than injunctive or declaratory relief, the *Ex parte Young* doctrine does not apply. *Fla. Ass'n of Rehab. Facilities, Inc. v. Fla. Dep't of Health and Rehab. Servs.*, 225 F.3d 1208, 1220 (11th Cir. 2000) ("[T]he Eleventh Amendment does not generally prohibit suits against state officials in federal court seeking only prospective injunctive or declaratory relief, but bars suits seeking retrospective relief such as restitution or damages."); *see Ex parte Young*, 209 U.S. 123 (1908). Mack's claims against Larkin in his official capacity are thus due to be dismissed.

2.  Individual Capacity Claims

Larkin further contends that he is entitled to qualified immunity with regard to the claims against him in his individual capacity. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)) (internal quotation marks omitted). "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). To determine whether a defendant is entitled to qualified immunity, this Court asks whether a constitutional or statutory right "would have been violated under the plaintiff's version of the facts," *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (emphasis deleted), and whether that right "was 'clearly established' at the time of [the] defendant's alleged misconduct," *Pearson*, 555 U.S. at 232.

Here, Mack alleges that his Fourth Amendment rights were violated because Larkin's affidavit, which served as the basis for the warrant used to search Mack's

home, falsely stated that Benson had possessed marijuana at Mack's address. "[A] search warrant is void under the Fourth Amendment if the affidavit supporting the warrant contains 'deliberate falsity or . . . reckless disregard' for the truth." *Madiwale v. Savaiko*, 117 F.3d 1321, 1326 (11th Cir. 1997) (quoting *Franks v. Delaware*, 438 U.S. 154, 171 (1978)). The Fourth Amendment "requires that warrant applications contain sufficient [factual] information to establish probable cause." *Holmes v. Kucynda*, 321 F.3d 1069, 1083 (11th Cir. 2003) (quoting *Franks*, 438 U.S. at 164). Although the statements in a warrant application need not "be objectively accurate," they must "be 'truthful' in the sense that the information put forth is believed or appropriately accepted by the affiant as true." *Id.* (quoting *Franks*, 438 U.S. at 165). A "warrant application [that] include[s] deliberately false statements" does not satisfy this requirement. *Id.*

Larkin argues that Mack "appears to contend that [Larkin] violated [Mack's] constitutionally protected rights by unreasonably relying upon the testimony of a reliable confidential informant." However, Mack actually alleges that Larkin provided information from the confidential informant in the warrant affidavit despite Larkin's knowledge that this information was false. Specifically, the complaint states that Larkin knew, because he had seen the video of the controlled buy—which did not take place at Mack's residence—that "there was

absolutely no probable cause supportive of a reasonable belief that marijuana or any other illegal drugs were being sold or stored" at Mack's address. Under these facts, which this Court must accept as true in ruling on Larkin's motion to dismiss, *Johnson*, 823 F.3d at 1337, Larkin's submission of the affidavit in order to obtain a warrant to search Mack's home violated Mack's constitutional right to be free from unreasonable searches and seizures without probable cause. *See Kingsland v. City of Miami*, 382 F.3d 1220, 1232 (11th Cir. 2004) ("[F]alsifying facts to establish probable cause is patently unconstitutional.").

Further, such a right was "clearly established" at the time Larkin obtained the search warrant on November 18, 2014. "For the law to be 'clearly established,' case law must ordinarily have been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Priester v. City of Riviera Beach*, 208 F.3d 919, 926 (11th Cir. 2000). "[I]n the absence of fact-specific case law, the plaintiff may overcome the qualified immunity defense when [a] preexisting general constitutional rule applies 'with obvious clarity to the specific conduct in question,' and it must have been 'obvious' to a reasonable police officer that the pertinent conduct given the circumstances must have been unconstitutional at the time." *Vinyard v. Wilson*, 311 F.3d 1340, 1352 (11th Cir.

2002). Multiple Eleventh Circuit and United States Supreme Court cases decided prior to Larkin's allegedly knowing submission of the inaccurate affidavit unequivocally state that "the Constitution prohibits an officer from making perjurious or recklessly false statements in support of a warrant." *Kelly v. Curtis*, 21 F.3d 1544, 1554 (11th Cir. 1994); *e.g.*, *Franks*, 438 U.S. at 164–15; *Kingsland*, 382 F.3d at 1232; *Holmes*, 321 F.3d at 1083; *Madiwale*, 117 F.3d at 1326. Larkin is thus not entitled to qualified immunity at this stage in the proceedings, and his motion to dismiss Mack's claims against him on this basis is due to be denied. Larkin is not precluded from asserting qualified immunity at a later stage when the facts are more fully developed.

### D. Other Defendants' Motion to Dismiss

#### 1. Official Capacity Claims

Mack's claims against Windham, Mills, Cousette, and Jones in their official capacities are construed as claims against the City. *Busby*, 931 F.2d at 776. These claims fail for the same reason as Mack's claims against Maddox and are similarly due to be dismissed.

#### 2. Individual Capacity Claims

With respect to the claims against them in their individual capacities, Windham, Mills, Cousette, and Jones contend that they are entitled to qualified

immunity. As they point out, Mack's claims against them are distinguishable from the claims against Larkin because they did not apply for the search warrant.[6] Larkin's allegedly false statement in the search warrant application does not impute a constitutional violation to the officers executing the warrant. *See Dahl v. Holley*, 312 F.3d 1228, 1235 (11th Cir. 2002) (granting summary judgment to officers in unlawful search claim based on "false statements in the search warrant affidavit," where officers did not "play[] any role in applying for the warrant"). Thus, the issue is whether Windham, Mills, Cousette, and Jones violated Mack's constitutional rights by executing a search warrant that they allegedly knew to contain a false statement.

A search warrant that "may be voided [because] the affidavit supporting the warrant contains deliberate falsity or reckless disregard for the truth," *id.*, remains valid if the warrant affidavit includes "sufficient content . . . to support a finding of probable cause" when the misstatement is removed. *Madiwale*, 117 F.3d at 1326. An affidavit submitted in support of a search warrant for a residence "should establish a connection between the [suspect] and the residence to be searched and a link between the residence and any criminal activity." *United States v. Martin*, 297

---

[6] Although Mack generally alleges that Defendants "conspired" to submit a false warrant application, the affidavit attached to Mack's complaint includes only Larkin's name. Mack fails to allege any specific facts showing that Defendants "'reached an understanding' to violate [his] constitutional rights." *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1260 (11th Cir. 2010). Mack's conspiracy claims are therefore due to be dismissed.

F.3d 1308, 1314 (11th Cir. 2002); *United States v. Brundidge*, 170 F.3d 1350, 1352 (11th Cir. 1999) ("Probable cause to support a search warrant exists when the totality of the circumstances allow[s] a conclusion that there is a fair probability of finding contraband or evidence at a particular location."). Here, if the inaccurate statement that Benson resided at Mack's address is omitted, then the affidavit provides no probable cause to search Mack's home. The affidavit would state only that "a reliable confidential informant . . . personally observed a quantity of marijuana in the possession of [Benson] while at his residence." Omitting the portion of the affidavit stating that Benson resided at Mack's address thus severs any nexus between Mack's home and Benson or his criminal activity.

The officers nonetheless contend that they "had a right to rely upon a facially valid search warrant issued by a state court judge." Generally, when a warrant is issued, "a police officer is entitled to rely on the magistrate's probable cause determination, as long as that reliance is objectively reasonable." *Jones v. Brown*, 649 F. App'x 889, 890 (11th Cir. 2016) (per curiam) (citing *United States v. Leon*, 468 U.S. 897, 922 (1984)). "[T]he fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or . . . in 'objective good faith.'" *Messerschmidt*, 565 U.S. at 547. But where "it is obvious that no reasonably competent officer would have concluded that a

warrant should issue," the officer is not entitled to "[t]he 'shield of immunity' otherwise conferred by the warrant" because he has not acted in an objectively reasonable manner. *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 345 (1986)); *see Leon*, 468 U.S. at 914–15 (explaining situations in which "reviewing courts will not defer" to a magistrate's finding that probable cause exists to issue a warrant). It is clear that an officer cannot be said to have acted in an objectively reasonable manner "where the magistrate . . . was misled by information in an affidavit that the affiant knew was false." *United States v. Robinson*, 336 F.3d 1293, 1296 (11th Cir. 2003). It is not clear, however, that this principle applies to an officer who merely executes, but does not apply for, the warrant. *See Malley*, 475 U.S. at 344 ("[T]he same standard of objective reasonableness that we applied in the context of a suppression hearing . . . defines the qualified immunity accorded an officer *whose request for a warrant* allegedly caused an unconstitutional arrest." (emphasis added)).

Further, although Mack alleges that the officers had viewed the video of the controlled buy, he does not plead that they read Larkin's affidavit prior to executing the warrant or that they otherwise knew what the affidavit said. Even if the officers had read the affidavit, the authorizing judge may have taken testimony beyond the affidavit in support of the warrant application. *See Martin*, 297 F.3d at

1317. The facts in the complaint do not merit an inference that at the time of executing the warrant, Windham, Mills, Cousette, and Jones knew that Larkin had submitted an affidavit containing a false statement or that the warrant was invalid for that reason. As such, it cannot be said that "no reasonably competent officer" would have executed the facially valid search warrant under these circumstances. Most importantly, this Court has found no relevant case law, and the parties have supplied none, standing for the proposition that an officer violates an individual's constitutional rights by executing a facially valid warrant despite his knowledge that the affidavit submitted by another officer in support of the warrant contained a false statement. Therefore, even assuming that Windham, Mills, Cousette, and Jones violated Mack's constitutional rights by executing the warrant, such a violation was not "clearly established" in November 2014. Their motion to dismiss is due to be granted.

## IV. Conclusion

For the reasons stated herein, Maddox's motion to dismiss (Doc. 15) is due to be GRANTED and the claims against him DISMISSED. Larkin's motion to dismiss (Doc. 7) is due to be GRANTED IN PART and DENIED IN PART. Mack's claims against Larkin in his official capacity are due to be DISMISSED, but the claims against him in his individual capacity remain pending. Finally, the

motion to dismiss filed by Windham, Mills, Cousette, and Jones (Doc. 13) is due to be GRANTED and the claims against them DISMISSED. A separate order consistent with this opinion will be entered contemporaneously herewith.

DONE and ORDERED on June 19, 2017.

_____
L. Scott Coogler
United States District Judge

186289