IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | |
|---|---|
| WILLIE LOUIS MACK, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) 7:16-cv-01872-LSC |
| WALTER MADDOX, et al., | ) ) ) |
| Defendants. | ) ) |

**MEMORANDUM OF OPINION**

Before the Court is Defendant Deputy M. T. Larkin's ("Larkin") Motion for Summary Judgment. (Doc. 33.) Plaintiff, Willie Louis Mack ("Mack"), brought this case alleging federal constitutional violations under 42 U.S.C. § 1983 and comparable state-constitutional claims (Doc. 1.) For the reasons stated below, Larkin's Motion for Summary Judgment is due to be granted.

**I. BACKGROUND**[1]

---

[1] The purpose of a motion for summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Camp Creek Hosp. Inns, Inc. v. Sheraton Franchise Corp.*, 139 F.3d 1396, 1400 (11th Cir. 1998) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Thus, the facts as presented in this section are taken only from statements of fact in the parties' briefs supported by record evidence. While Mack includes many unsupported allegations concerning the conduct of Larkin and the West Alabama Narcotics Task Force ("WANTF") agents, bare allegations not supported by materials in the record are insufficient to create a material dispute sufficient to overcome summary judgment. *See* Fed. R. Civ. P. 56(c); *see also* Fed. R. Civ. P. 56(e) ("If a party fails to properly . . .

In the fall of 2014, the West Alabama Narcotics Task Force ("WANTF") received information that an individual by the name of Anthony Carl Benson ("Benson") was involved in the trafficking of marijuana in the Tuscaloosa area. A Confidential Information ("C.I.") informed Larkin, a sheriff's deputy working with WANTF, that he had seen a quantity of marijuana in the possession of an individual named Anthony Carl Benson ("Benson") at the location 10 Juanita Drive. (Doc. 33-3 at 2.) After a preliminary records search, Larkin could not verify that Benson had an interest in the property, but saw that it was a rental property.

"In order to verify the information from the C.I.," Larkin asked the C.I. to make a drug buy at 10 Juanita Drive. (*Id*.; *see also* Doc. 45 at 33 "Q: . . . you did the controlled drug buy in order to corroborate [the C.I.'s] information that he had previously given to you that he had been inside 10 Juanita Drive and observed . . . Benson with a quantity of marijuana in that home? Larkin: That's correct.").) On November 17, 2014, Larkin equipped the C.I. with a video and audio recording device and purchase money. The C.I. then recorded his drug purchase from Benson.

---

address another party's assertion of fact as required by Rule 56(c), the court may: . . . (2) consider the fact undisputed for purposes of the motion; . . . .").

According to Larkin, "the recording describe[d] [the C.I.] approaching the residence at 10 Juanita Drive when [he] encountered the suspect." (Doc. 33-3 at 3.) Benson was not in the 10 Juanita Drive residence, but in a car parked either at the residence or at one of the nearby residences. After the C.I. stopped his car and got out, the video recording momentarily showed a lightly colored house as the C.I. turned towards Benson's car. The C.I. then entered the car to buy drugs from Benson. After the purchase, the C.I. returned to his car and drove away.

Following the buy, the C.I. turned the substance bought over to Larkin. (Doc. 33-3 at 3.) "The substance was positively identified as marijuana." (*Id.*) The next morning, Larkin returned to where he approximately thought the drug buy occurred to obtain information on the house located at 10 Juanita Drive. (Doc. 45 at 27-28 ("I verified 10 Juanita Drive by visually seeing it myself and also observing the distance that [the C.I.] pulled down to 10 Juanita Drive the night before, or whatever date it was he did the buy. I did research like that to verify the address.").)

On November 18, 2014, the day after the controlled drug buy, Tuscaloosa County Circuit Judge Brad Almond issued a warrant authorizing the search of Mack's address, 10 Juanita Drive, which was described in the warrant as "a tan residence with a red roof," for controlled substances. (Doc. 33-2 at 75.) The subject

of the warrant was an individual named Benson, "a black male in his mid[-]twenties [who is] approximately 6'05" tall and weighs approximately 252 pounds." (*Id.*) Larkin had prepared the warrant application, which asserted that he "received information from a reliable confidential informant that [the confidential informant] ha[d] personally observed a quantity of marijuana in the possession of a black male known as . . . Benson while at his residence of 10 Juanita Drive." (*Id.*) Notably, the warrant application did not include reference to the purchase of marijuana by the C.I. from Benson that occurred on November 17, 2014. (*See id.*)

WANTF officers then executed the search warrant at the 10 Juanita Drive location. Mack, who was present at 10 Juanita Drive at the time, objected to the search of the residence on the assertion that Benson never lived there nor visited Mack's house. Regardless, the officers conducted the search. During the search of the home, the officers discovered "a pack of rolling papers and a single partially smoked marijuana cigarette."

As a result of the search, Mack, proceeding *pro se*, filed this action against Defendants Walter Maddox, in his official capacity as the Mayor of the City of Tuscaloosa, WANTF, and several WANTF agents and criminal investigators in their individual and official capacities alleging federal and state constitutional violations. After the Defendants filed motions to dismiss, this Court dismissed the

claims against all Defendants except Larkin. (*See* Doc. 23.) This Court granted Larkin's motion in part and denied it in part dismissing the claims against Larkin in his official capacity, but holding that Larkin was not entitled to qualified immunity at the motion-to-dismiss stage for Mack's individual capacity claims. (*Id.*) Following discovery, Larkin filed his Motion for Summary Judgment seeking dismissal of the remaining individual capacity claims.

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is a "genuine dispute" as to a material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The trial judge should not weigh the evidence but simply determine whether there are any genuine issues that should be resolved at trial. *Id.* at 249.

In considering a motion for summary judgment, trial courts must "consider[] all of the evidence and the inferences it may yield in the light most favorable to the nonmoving party." *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013) (citations omitted). Although "*pro se* complaints

are entitled to a liberal interpretation by the courts, . . . a *pro se* litigant does not escape the essential burden under summary judgment standards of establishing that there is a genuine issue as to a fact material to his case in order to avert summary judgment." *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990) (emphasis added). In making a motion for summary judgment, "the moving party has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *Id.* Although the trial courts must use caution when granting motions for summary judgment, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

### III. DISCUSSION [2]

Larkin moves for dismissal of Mack's remaining claims against him in his individual capacity, arguing he is entitled to qualified immunity. Qualified immunity "offers complete protection for government officials sued in their

---

[2] Larkin originally filed his Motion for Summary Judgment on October 30, 2017. Thereafter, the Court granted Mack multiple extensions of time in order to conduct discovery. (*See* Docs. 35 & 40.) In the final extension of time granted to Mack, the Court emphasized that his Response was due no later than January 2, 2018. (Doc. 40.) Mack nonetheless failed to file his Response until January 24, 2018. (Doc. 45.) While Mack gives no good reason for this delay, and Larkin argues Mack's tardily filed Response should be struck, (doc. 46), the Court need not resolve this dispute. Even considering the arguments in Mack's Response, Larkin's Motion for Summary Judgment is still due to be granted.

individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Hoyt v. Cooks*, 672 F.3d 972, 977 (11th Cir. 2012) (citation omitted). "Under qualified immunity analysis, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly unconstitutional acts took place." *Storck v. City of Coral Springs*, 354 F.3d 1307, 1314 (11th Cir. 2003); *see also Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004). If the official is unable to prove that he was acting within his discretionary authority, he is not entitled to qualified immunity. *Lumley v. City of Dade City*, 327 F.3d 1186, 1194 (11th Cir. 2003). To determine whether Larkin acted within his discretionary authority, the Court must ask whether his actions "(1) were undertaken 'pursuant to the performance of his duties,' and (2) were 'within the scope of his authority.'" *Dang ex rel. Dang v. Sheriff, Seminole Cty.*, 871 F.3d 1272, 1279 (11th Cir. 2017) (quoting *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988)). "In applying each prong of this test, [the court] look[s] to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." *Holloman*, 370 F.3d at 1266.

It is undisputed that Larkin's preparation of and application for a search warrant is a proper exercise of his discretionary authority. Larkin directed the C.I. and later applied for the search warrant as part of his duties working with WANTF, a task force that specializes in deterring the trafficking and use of illegal drugs, including marijuana. Courts commonly hold peace officers are acting within their discretionary authority when they file affidavits and apply for arrest or search warrants. *See Rich*, 841 F.2d at 1564. Larkin has thus made his initial showing that the complained-of actions were within his discretionary authority.

"Once a defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity. *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003). "To overcome qualified immunity, the plaintiff must satisfy a two prong test; he must show that: (1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Holloman*, 370 F.3d at 1264 (citing *Wilson v. Layne*, 526 U.S. 603, 609 (1999)).

Mack contends that Larkin violated his Fourth Amendment right to be free from unreasonable search and seizure[3] by including false statements and making

---

[3] Mack' Complaint additionally alleges Larkin violated his Fourth, Fifth, Eighth and Fourteenth Amendment rights when Larkin submitted a knowing and intentionally false probable cause affidavit to Tuscaloosa County Circuit Judge Brad Almond. (Doc. 1 at 5, 6.) While Mack correctly notes that the Court did not explicitly dismiss any of his constitutional claims against

material omissions in the application and affidavit used to procure the search warrant for 10 Juanita Drive. (Doc. 1 at 6.) To overcome a defense of qualified immunity, the plaintiff must show that the officer deliberately or recklessly made false statements in his warrant affidavit that were necessary to a finding of probable cause to overcome the defense of qualified immunity. *See Dahl v. Holley*, 312 F.3d 1228, 1235 (11th Cir. 2002). This rule, however, does not apply to misrepresentations or omissions that were only negligent. *Kelly v. Curtis*, 21 F.3d 1544, 1554-55 (11th Cir. 1994). Statements in a warrant need not be objectively accurate but must be "truthful in the sense that the information put forth is believed or appropriately accepted by the affiant as true." *Holmes v. Kucynda*, 321 F.3d 1069, 1083 (11th Cir. 2003) (internal quotations omitted); *see Kelly*, 21 F.3d at 1554-55 (no Fourth Amendment violation where officer testified to facts during probable cause hearing that were false, but there was no showing that officer reckless or intentionally testified to false facts).

---

Larkin in Larkin's individual capacity in its Memorandum of Opinion (Doc. 23), all claims except his Fourth Amendment Claim *should have been* dismissed as Mack made no showing in any of his pleadings in opposition to Larkin's assertion of qualified immunity at the motion-to-dismiss stage that Larkin (1) violated the Fifth, Eighth, or Fourteenth Amendments, or (2) that those rights were clearly established. *See Holloman*, 370 F.3d at 1264. As Mack has not raised any argument in his Response in Opposition to Summary Judgment concerning other constitutional injuries under the Fifth, Eighth, or Fourteenth Amendments, he has not met his burden to overcome Larkin's assertion of qualified immunity.

In this case, Mack presents no evidence that Larkin deliberately or recklessly misstated any facts known to him at the time he wrote the affidavit or omitted any material fact that would negate a finding of probable cause. Mack's first theory for Larkin's Fourth Amendment violation is that Larkin did not sufficiently corroborate the C.I.'s statements:

> [T]here is overwhelming record evidence that Defendant Larkin was completely unable to state with any level of specificity or reasonableness that his confidential informant had previously observed Benson in the possession of a quantity of marijuana while inside . . . the 10 Juanita Drive residence.

(Doc. 45 at 10.) Mack's allegation is demonstrably false, and he has presented *no evidence at all* to support the above assertion. During Larkin's deposition, Larkin repeatedly testified that he (1) relied on his C.I., who had proved to reliable in the past, (2) asked the C.I. to conduct a drug buy at 10 Juanita Drive to corroborate the C.I.'s earlier statement that he had seen drugs at that location, and (3) conducted independent research around the Juanita Drive. (Doc. 45 at 21-24, 27.)

Mack confuses the evidentiary requirements for use of information provided by a confidential informant. (*See, e.g.*, *id.* at 12 ("Larkin has offered nothing by way of sufficient evidence supportive of his self-serving claim what the informant allegedly told him about Benson.").) The Eleventh Circuit has held that for:

> determining whether an informant's tip rises to the level of probable cause, we assess the totality of the circumstances. We consider the

relevance of factors such as the informant's "veracity," "reliability," and "basis of knowledge." In addition, the corroboration of the details of an informant's tip through independent police work adds significant value to the probable cause analysis.

*Case v. Eslinger*, 555 F.3d 1317, 1327 (11th Cir. 2009) (quoting *Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir. 1996)). Larkin need not present other evidence outside of his own sworn testimony that the C.I. told him that Benson possessed drugs at 10 Juanita Drive. Larkin also established the veracity, reliability, and basis of knowledge of his C.I., and later corroborated the tip by means of a drug buy from Benson in the vicinity of the provided address and an independent visit to the location. Larkin's sworn deposition testimony is sufficient; Mack also admitted during his own deposition he had no evidence to contradict Larkin's testimony. (Doc. 33-2 at 31.)

Nor does it ultimately matter whether the subsequent drug buy occurred at 10 Juanita Drive or in the vicinity of 10 Juanita Drive. The application for search warrant does not state that the C.I. purchased marijuana from Benson in 10 Juanita Drive; it states instead that the C.I. *observed* Benson inside the residence with marijuana: "YOUR AFFIANT HAS RECEIVED INFORMATION FROM A RELIABLE [C.I.] THAT HAS PERSONALLY OBSERVED A QUANTITY OF MARIJUANA IN THE POSSESSION OF A BLACK MALE KNOWN AS [Benson] WHILE AT HIS RESIDENCE OF 10 JUANITA DR . . . ." (Doc. 33-2 at

75.) Larkin based his statement about the C.I. and Benson being in 10 Juanita Drive on the C.I.'s statement to Larkin that he had done so. (Doc. 45 at 32 "[T]he search warrant wasn't based off the buy. The buy was for me to corroborate his story. The search warrant was based off him being in the residence prior to me [asking him to] do[] a buy."). Larkin states that this particular C.I. had been used in prior cases and had always proved reliable. (*Id.* at 21 ("[H]e was a reliable CI. He'd been used several times, and his information was credible.")). Mack has not shown that the warrant or "the affidavit supporting the warrant contains deliberate falsity or reckless disregard for the truth, . . . [or] includes material omissions." *Dahl*, 312 F.3d at 1235.

Mack additionally disputes whether Benson and the C.I. were ever in fact actually in 10 Juanita Drive. Mack's statement challenges the truth of the C.I.'s statements to Larkin; but this is irrelevant to whether Larkin deliberately or recklessly included falsities or material omissions in his affidavit and application for search warrant. Mack has presented no evidence that the C.I. told Larkin something different than what Larkin stated in the affidavit because, as Mack admits, he has no personal knowledge of a conversation between Larkin and the C.I. (Doc. 33-2 at 31 ("Q: But you don't have, as we sit here today, you don't have any evidence that the [C.I.] told Deputy Larkin that drugs were or were not in your

house, correct? [Mack]: I don't know what he told Agent Larkin, so I can't speak on that, sir."). While Mack testified during his deposition that neither he nor his family ever saw Benson or the C.I. in 10 Juanita Drive, this testimony alone does not prove that Larkin falsified evidence on his affidavit. Instead, Mack's statement is relevant to whether the C.I. told the truth to Larkin about being inside 10 Juanita Drive.

That the C.I. returned to the area around 10 Juanita Drive and bought drugs from Benson further shows that Larkin attempted to verify the information the C.I. gave him, and the reasonableness of his reliance. In his Response, Mack continually focuses on an approximately one-second period in the C.I.'s video taken during the buy where the C.I. exits his vehicle to enter the vehicle of Benson to purchase marijuana. Mack contends that the video includes a brief shot of a white house that is not his, and thus Larkin should have known the C.I. was mistaken about which house Benson had previously been in.

Mack contends that the home shown in the video does not have a red roof and tan sides like 10 Juanita Drive, but is instead a white house with a carport. (Doc. 45 at 11, 12.) The video clip is unhelpful to Mack's argument for numerous reasons. As the home is shown in the video for approximately one to two seconds, and the frames of the house are portrayed as the C.I. turns to get out of his vehicle,

it is difficult to even understand which direction the C.I. is oriented in relation to the home. The C.I. is not at the white house, but near or next to it. The video itself is highly pixelated and unclear, and does not portray normal colors but appears to be some form of monochromatic night vision showing all colors in a shade of purple to red. (Doc. 33-4 (Surveillance Video at 09:28:23-25).) Thus, the house is not "white" at Mack contends, but a shade of purple, although Mack infers the house is white based on comparison of its shade of purple with the surrounding features.

More importantly, Larkin stated that he did not use what was visually portrayed in the video because it was unclear for the reasons stated above. Instead, Larkin relied on the audio of the recording where the C.I. repeatedly stated that he was approaching 10 Juanita Drive.[4] (Doc. 45 at 31, 43; *see id.* at 29-30 (Q: Deputy Larkin, can you honestly say that the video footage of the controlled drug buy corroborates the verbal information your [C.I.] gave in the recording? [Larkin]: "I can't say about the video, but based off my observation of the distance from where he was to where I was, his general statement that he went to number 10 Juanita Drive and that he'd been to the residence prior to us obtaining the search warrant, because he was a reliable confidential informant at the time.").) Larkin then

---

[4] Mack additionally focuses on the C.I.'s statement in the video that Benson's alias was "Zoe." Again, this information does not disprove the earlier fact that the C.I. told Larkin that the dealer's legal name was Benson, it is just additional information.

double-checked the next day which house really belonged to the address 10 Juanita Drive, by going to that location and estimating from the video how much time passed after the C.I. turned onto Juanita Drive until he pulled into a driveway in the video. (Doc. 45 at 27.)

Even assuming the factual inferences taken from the C.I.'s video in Mack's favor, Mack still fails to show that Larkin knowingly or recklessly falsified his affidavit. Statements in a warrant need not be objectively accurate but must be "truthful in the sense that the information put forth is believed or appropriately accepted by the affiant as true." *Holmes*, 321 F.3d at 1083 (quotation omitted). Ultimately, Mack argues a Fourth Amendment violation occurred because he would have drawn different inferences from the facts that Larkin had before him, but this is not the Court's role:

> Qualified immunity analysis does not direct courts to play the role of crime scene investigators, second-guessing police officers' determinations as to whether a crime was committed with a handgun or a shotgun, or whether violence was gang related or a domestic dispute. Indeed, we have warned courts against asking "whether another reasonable, or more reasonable, interpretation of the events can be constructed five years after the fact."

*Messerschmidt v. Millender*, 565 U.S. 535, 565 (2012) (Sotomayor, J., dissenting) (quoting *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (per curiam)). Even if Larkin was mistaken in which house he should have put in the affidavit, Larkin had enough

evidence to warrant his belief that 10 Juanita Drive was the location where Benson was operating. Larkin had information from a reliable confidential informant that the informant saw Benson in possession of marijuana in 10 Juanita Drive. (Doc. 33-2 at 75.) The C.I. then narrates that he is approaching 10 Juanita Drive in the subsequent drug buy video. (Doc. 45 at 28.) Later, when Larkin returned to the approximate spot of the drug buy the day after it occurred, a tan house with a red roof was located beside the area he thought the C.I. stopped his car to make the drug buy. (Doc. 45 at 27-28.) Finally, a tan house with a red roof occupies the property at 10 Juanita Drive. From this evidence, the information that Larkin put in the affidavit could be appropriately accepted by him as true.

In addition, even though Larkin did not mention the possible presence of another house in the video, nor that he returned to 10 Juanita Drive to corroborate the address in his affidavit, the omission of these facts does not amount to a Fourth Amendment violation. An officer is entitled to qualified immunity even though his affidavit in support of a search warrant contains factual omissions, unless the officer knows the omission is critical to a finding of probable cause. *Haygood v. Johnson*, 70 F.3d 92, 94-95 (11th Cir. 1995); *Madiwale v. Savaiko*, 117 F.3d 1321, 1327 (11th Cir. 1997). Even considering that Larkin omitted the information identified by Mack, those omissions are not critical or material to a finding of

probable cause. That the video showed a home that was not Mack's at an undefined location when the C.I. got out of his car does not change the C.I.'s earlier statement that he had observed Benson with marijuana inside 10 Juanita Drive. That Larkin physically visited the location and corroborated the C.I.'s story would actually strengthen Larkin's application.

### IV. CONCLUSION

For the reasons stated above, Larkin's Motion for Summary Judgment is due to be GRANTED and Mack's remaining claims are due to be dismissed. A separate order consistent with this Opinion will be entered.

**DONE** AND **ORDERED** ON MARCH 21, 2018.

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE

190485